The BRANCH LAW FIRM L.L.P. and
Turner Branch, Appellants

v.

W. Shane OSBORN, Appellee

NO. 14–14–00892–CV

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion filed February 4, 2016

Rehearing Denied April 7, 2016

**2**

Elizabeth Rivers, Ronald G Franklin, Thomas C. Wright, Wanda Fowler, Tamara Danielle Stiner Toomer, Houston, TX, for Appellants.

Corey J. Seel, Ernest W. Boyd Jr., Christopher Grimm, Houston, TX, for Appellee.

Panel consists of Chief Justice Frost, and Justices Donovan and Brown.

## OPINION

Marc. W. Brown, Justice

Once again, this court considers whether the trial court abused its discretion in denying a motion in which appellants—the Branch Law Firm L.L.P. and Turner Branch—sought to compel appellee W. Shane Osborn to arbitrate his claims. The Branch Parties relied upon an arbitration clause in a settlement agreement among a pharmaceutical company, participating claimants, and participating law firms. In a previous appeal, where the trial court had not reviewed the entirety of the agreement, we affirmed the court's order denying the motion, without prejudice to the movants' ability to be heard on the merits of a subsequent motion to compel. *Branch Law Firm, L.L.P. v. Osborn,* 447 S.W.3d 390, 391 (Tex.App.—Houston [14th Dist.] 2014, no pet.). This time, having the entire agreement, we conclude that a valid arbitration agreement exists which binds Osborn and that Osborn's claims fall within the scope of the agreement. We also conclude that Osborn has failed to meet his burden to establish a defense to enforcing arbitration. Therefore, we reverse and remand. We also deny Osborn's motion to dismiss.

### I. Factual and Procedural Background

In August 2010, W. Shane Osborn began working as an associate for the Branch Law Firm L.L.P., a Texas limited liability partnership located in Houston, Texas (the "Texas Law Firm"), with an initial annual salary of $50,000. In October 2011, Osborn received a raise in annual salary to $100,000. According to Osborn, his bonus structure consisted of 10% of attorney's fees in any case he worked on, plus another 15% if he originated the case, as well as at least 5% of the total fees collected from the Plaintiff Steering Committee allocation for the hours billed in the Avandia multidistrict litigation (Avandia MDL). Osborn was terminated on May 7, 2012. According to Osborn, he did extensive work on the Avandia cases that required frequent travel to work in Albuquerque, New Mexico. In addition to working on the Avandia MDL, Osborn worked on a mass tort case involving hip implants, and one individual lawsuit.

In June 2012, Osborn filed suit against the Texas Law Firm and Turner Branch (collectively, the "Branch Parties"). Turner Branch is a partner in the Texas Law Firm and a principal, officer, and major stockholder in the Branch Law Firm in New Mexico (the "New Mexico Law Firm"). Osborn alleged breach of contract based upon the Branch Parties' refusal to pay him the 10% and 5% bonuses, as well as the Branch Parties' alleged failure to pay him for working May 1 through May 7, 2012. Osborn also asserted a fraud claim based on the Branch Parties'

alleged material misrepresentation of the 10% bonus. The Branch Parties filed counterclaims against Osborn for breach of fiduciary duty, fraud, unjust enrichment, conversion, and theft, alleging his fraudulent use of a firm credit card for personal charges.

In September 2012, Osborn filed a motion to compel the Branch Parties to file answers to his interrogatories, specifically with regard to the amount of attorney's fees received in cases Osborn worked on, including the Avandia cases. The parties took opposite positions as to whether the amount of attorney's fees to be paid under a Master Settlement Agreement (the "MSA") should remain confidential. In December 2010, the MSA was signed by attorneys on behalf of GlaxoSmithKline LLC ("GSK") and signed by Turner Branch of the New Mexico Law Firm, "On Behalf Of The Participating Claimants And The Participating Law Firms." In April 2013, the trial court granted the motion to compel and ordered the Branch Parties to provide Osborn with the amount of attorney's fees, as well as the settlement amount, as contained in the MSA.

Osborn amended his suit to add Turner W. Branch, P.A., a New Mexico professional association located in Albuquerque, New Mexico, as a defendant. In his amended petition, Osborn added claims for quantum meruit, promissory estoppel, fraudulent inducement, abuse of process, and malicious prosecution. By this time, Osborn and the Branch Parties had filed various motions for summary judgment.

Turner W. Branch, P.A. has filed a special appearance and is not a party to this appeal. The Branch Law Firm (the New Mexico Law Firm) is a registered trademark of Turner W. Branch, P.A.[1] Osborn alleged that the Texas Law Firm and the New Mexico Law Firm are the alter egos of Turner Branch, and that "there is such a unity of interest" among the defendants that holding only one of them responsible would be unjust. Osborn also alleged that Turner Branch, the Texas Law Firm, and the New Mexico Law Firm were jointly and severally liable based on several common law principles, including "principal/agent liability, partnership liability, joint enterprise liability, [and] single business enterprise."

In June 2013, the Branch Parties filed a motion to compel arbitration and stay proceedings based upon the MSA. They attached a "redacted copy of portions of the MSA relevant to this motion." Osborn filed a motion to compel compliance with the court's April 2013 order because the defendants still had not provided the amount of attorney's fees and amount of settlement contained in the MSA, and specifically had redacted the settlement amount in the copy of the MSA they had provided. The trial court held a hearing on the parties' motions. The trial court signed an order that the Branch Parties had to provide Osborn with the amount of attorney's fees and amount of settlement as contained in the MSA by the end of business that day and signed an order denying the Branch Parties' motion to compel arbitration and stay proceedings.

The Branch Parties appealed the denial of their motion to compel arbitration. In a majority opinion, we affirmed without prejudice to the Branch Parties' filing another motion where they failed to submit the entirety of the MSA to the trial court.

---

1. For consistency, in this opinion we refer to Turner W. Branch, P.A. and to the Branch Law Firm as the New Mexico Law Firm.

*Branch Law Firm,* 447 S.W.3d at 398–99.[2]

The Branch Parties filed a second motion to compel arbitration. The Branch Parties attached the entire MSA to their second motion, but did not attach any exhibits to the MSA. The Branch Parties argued that the MSA is a valid agreement to arbitrate and that Osborn's claims fall within the scope of the broad arbitration clause. While they acknowledged Osborn did not sign the MSA, they argued that he otherwise is bound to its terms under ordinary contract and agency law. They further contended that Osborn's claims against the Branch Parties were factually intertwined with the MSA such that all his claims must be arbitrated.

On September 25, 2014, Osborn filed his objection to the lack of exhibits and his response. The trial court held a hearing on September 26, 2014. The record reveals uncertainty about whether the exhibits actually had been created, but that the Branch Parties were attempting to get any additional documents authenticated so they could provide them to the trial court. The trial court indicated that the Branch Parties were not "disqualified" from filing another motion to compel: "I'm frankly telling you, go ahead and file a third motion because I know we're going to do this; but, yeah, I'm denying this one." The trial court on September 26 signed an order denying the Branch Parties' second motion to compel arbitration.

The Branch Parties filed a third motion to compel arbitration on October 10, 2014. This motion attached the entire MSA, as well as its exhibits. The third motion included a section arguing that the Branch Parties had not waived their right to seek arbitration. Osborn argued that in spite

of the additional exhibits, the Branch Parties' third motion to compel arbitration was actually a motion for the court to reconsider the denial of their second motion. Osborn further objected to the affidavit accompanying the MSA and its exhibits, which was executed by GSK's counsel, arguing that it was insufficient as a business records affidavit. The trial court held a hearing on October 24, 2014. The trial court declined to treat the Branch Parties' third motion to compel arbitration as a motion for reconsideration and, on October 24, signed an order denying the Branch Parties' third motion.

On October 28, 2014, Osborn filed a motion to vacate/motion to reconsider, requesting that the trial court vacate its October 24, 2014 order because a motion to compel arbitration is appealable while a motion for reconsideration is not. On October 29, 2014, the Branch Parties filed their notice of appeal from the trial court's October 24, 2014 order. On November 14, 2014, the trial court held a hearing, found that the Branch Parties' third motion to compel arbitration was a motion for reconsideration, and signed an order vacating its October 24 order. That same day, the Branch Parties filed a motion for the trial court to vacate its November 14, 2014 order.

Also that same day, the Branch Parties filed a motion for temporary relief in this court—requesting a stay of proceedings in the trial court, aside from their pending motion to vacate. Osborn responded that the appeal should be dismissed for want of jurisdiction. The Branch Parties responded to Osborn's motion to dismiss and moved this court to vacate the trial court's November 14, 2014 order. On December

---

**2.** Justice Donovan authored a dissent in which he concluded that the trial court should have granted the Branch Parties' motion to compel arbitration based on the por-

tions of the MSA before the court. *Branch Law Firm,* 447 S.W.3d at 401 (Donovan, J., dissenting).

8, 2014, the trial court denied the Branch Parties' motion to vacate. On December 16, 2014, this court vacated the November 14 order pursuant to Texas Rule of Appellate Procedure 29.5, which had the effect of reinstating the October 24, 2014 order. We stayed the trial proceedings pursuant to Texas Rule of Appellate Procedure 29.3. We have carried the motion to dismiss with this appeal.

On appeal, the Branch Parties argue: (1) the trial court erred in denying their motion to compel arbitration because Osborn is bound by a valid agreement to arbitrate, his claims fall within the scope of that agreement, and all of his claims are factually intertwined; (2) they have not waived their right to arbitration: (3)

Osborn has not proven prejudice; and (4) this court has jurisdiction over their appeal.

## II. ANALYSIS

### A. Jurisdiction

■ We first consider whether this court has jurisdiction. Interlocutory orders may be appealed only if permitted by statute and only to the extent jurisdiction is conferred by statute. *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 272 (Tex.1992) (orig.proceeding). We strictly construe statutes authorizing interlocutory appeals because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable. *CMH Homes v. Perez*, 340 S.W.3d 444, 447–48 (Tex.2011).

■ Section 171.098(a) of the Texas Civil Practice and Remedies Code, which grants the courts of appeals jurisdiction over appeals of certain interlocutory orders in arbitration proceedings, provides that "[a] party may appeal a judgment or decree entered under this chapter or an order . . . denying an application to compel arbitration made under Section 171.021." Tex. Civ. Prac. & Rem.Code Ann. § 171.098(a)(1) (West 2013); *see* Tex. Civ. Prac. & Rem.Code Ann. § 171.021(a) (West 2013) (for applicant to prevail, must show that agreement to arbitrate exists and applies to parties' dispute, and that opposing party has refused to arbitrate). Likewise, where a matter is subject to the Federal Arbitration Act ("FAA"), an interlocutory appeal may be taken from an order denying an application to compel arbitration. 9 U.S.C. § 16(a)(1)(C); Tex. Civ. Prac. & Rem.Code Ann. § 51.016 (West 2013).[3]

■ Appeals from interlocutory orders are accelerated. Tex.App. P. 28.1(a). To timely perfect an accelerated appeal, the notice of appeal must be filed within 20 days after the order is signed. Tex.R.App. P. 26.1(b), 28.1; *In re K.A.F.*, 160 S.W.3d 923, 927 (Tex.2005). The times for filing a notice of appeal are jurisdictional, and absent a timely filed notice of appeal or an extension request, we must dismiss the appeal. *Verburgt v. Dorner*, 959 S.W.2d 615, 617 (Tex.1997) (after 15–day extension period for notice of appeal has passed,

---

**3.** The Branch Parties assert that the MSA is subject to the FAA because it relates to interstate commerce. "Interstate commerce" is not limited to the actual shipment of goods across state lines, but rather includes all contracts "relating to" interstate commerce. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 754 (Tex.2001) (orig.proceeding). The Branch Parties further assert that the outcome should be the same regardless of whether the FAA or the Texas General Arbitration Act ("TGAA") applies. Because the substantive principles applicable to the analysis in this appeal are the same under both the FAA and the TGAA, we cite in this opinion cases under the FAA and the TGAA without stating under which statute the cases were decided. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56, n. 10 (Tex.2008).

party can no longer invoke appellate court's jurisdiction); *see* Tex.R.App. P. 26.3.

Texas courts hold that a motion to reconsider the denial of a motion to compel arbitration does not extend the 20–day deadline for perfecting an appeal. *See, e.g., Wells Fargo Bank, N.A. v. Goldberg,* No. 09–10–00386–CV, 2011 WL 662952, at *2 (Tex.App.—Beaumont Feb. 24, 2011, no pet.) (mem.op.); *Nabors Well Servs. Co. v. Aviles,* No. 06–10–00018–CV, 2010 WL 2680087, at *2 (Tex.App.—Texarkana July 7, 2010, no pet.) (mem.op.); *Hydro Mgmt. Sys., LLC v. Jalin, Ltd.,* No. 04–09–00813–CV, 2010 WL 1817813, at *1 (Tex.App.—San Antonio May 5, 2010, no pet.) (mem. op.). However, where the motion at issue constitutes a motion to compel arbitration—not a motion to reconsider—and notice is otherwise timely, there is appellate jurisdiction. *See, e.g., Lucchese, Inc. v. Solano,* 388 S.W.3d 343, 348–49 (Tex. App.—El Paso 2012, no pet.).

The Branch Parties submitted their notice of appeal from the October 24, 2014 order five days later—on October 29. If the October 24 order was a denial of a distinct third motion to compel arbitration, then we have jurisdiction. If the October 24, 2014 order was actually a denial of a motion to reconsider denial of the second motion to compel, then any interlocutory appeal would need to be taken from the September 26, 2014 order.

Osborn relies on *Nabors Well Services.* There, the appellate court reviewed a motion to compel arbitration and an amended motion to compel, and determined that, "aside from references to additional evidence and caselaw, the motions are the same." 2010 WL 2680087, at *1. The court concluded the amended motion to compel was a motion for reconsideration that did not extend the appellate timetable

and dismissed for want of jurisdiction. *Id.* at *1–2.

Osborn also relies on *Goldberg.* There, the appellate court considered the substance of a motion to compel arbitration and a motion for reconsideration, and concluded that the trial court's second order "merely declined a request to reconsider the [prior] order" and was not appealable. 2011 WL 662952, at *1–2 (second motion incorporated substance and evidence of prior motion and requested trial court reconsider prior motion and compel arbitration).

Finally, Osborn relies on *Hydro Management.* There, the appellate court reviewed a motion to compel arbitration and a motion for reconsideration, and rejected the argument that the denial of the motion to reconsider was separately appealable where it cited additional authority. 2010 WL 1817813, at *1–2.

Osborn distinguishes *Lucchese.* There, the appellate court considered a motion to compel arbitration and an amended motion to compel arbitration based on different arbitration agreements. 388 S.W.3d at 346–47. The *Lucchese* court distinguished the case from *Goldberg, Nabors Well Services,* and *Hydro Management* and concluded that the amended motion included "new matter" and was appealable. *Lucchese,* 388 S.W.3d at 348–49 (citing Tex.R. Civ. P. 62).

The instant facts do not precisely line up with these cases. Upon our review of the Branch Parties' second and third motions, beyond attaching the exhibits to the MSA to the third motion, the third motion contains a new argument section on the issue of waiver of arbitration, which was not included in the second motion. In addition, during the hearing on the Branch Parties' third motion, the parties presented argument on their respective positions on waiver. The parties had not raised

waiver arguments during the hearing on the second motion. *Cf. Brand FX, LLC v. Rhine,* 458 S.W.3d 195, 201–02 (Tex. App.—Fort Worth 2015, no pet.) (no interlocutory appeal authorized from motion to reconsider where arguments already raised at previous hearing on motion to compel arbitration were included in motion to reconsider). Moreover, during the hearing on the third motion, the trial court stated that waiver was "another" reason for denying the third motion.

Accordingly, we conclude that the Branch Parties' third motion was a distinct motion to compel arbitration, properly subject to timely interlocutory appeal. We deny Osborn's motion to dismiss and now consider the merits.

### B. Standard of review and applicable law

Denial of a motion to compel arbitration generally triggers the abuse-of-discretion standard. *See In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 780 (Tex.2006) (orig.proceeding). "An order denying arbitration must be upheld if it is proper on any basis considered by the trial court." *In re Weeks Marine, Inc.,* 242 S.W.3d 849, 854 (Tex.App.—Houston [14th Dist.] 2007, orig. proceeding).

A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). Under this standard, we defer to a trial court's factual determinations if they are supported by evidence, but review a trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.,* 279 S.W.3d 640, 643 (Tex.2009) (orig.proceeding); *see D. Wilson Constr.,* 196 S.W.3d at 781 (existence of valid arbitration agreement is legal question).

Arbitration cannot be ordered in the absence of an agreement to arbitrate. *Freis v. Canales,* 877 S.W.2d 283, 284 (Tex.1994) (orig.proceeding) (per curiam). Therefore, despite strong presumptions that favor arbitration, a valid agreement to arbitrate is a settled, threshold requirement to compel arbitration. *See In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 737–38 (Tex.2005) (orig.proceeding). "Arbitration agreements are interpreted under traditional contract principles." *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex.2003). We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* at 229. The party moving to compel arbitration must establish the existence of a valid arbitration agreement and the existence of a dispute within the scope of that agreement. *Rachal v. Reitz,* 403 S.W.3d 840, 843 (Tex. 2013).

The trial court conducts a summary proceeding to determine the applicability of an arbitration clause. *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 130 (Tex. 2005) (orig.proceeding); Tex. Civ. Prac. & Rem.Code Ann. § 171.021(b) ("If a party opposing an application [for arbitration] denies the existence of the agreement, the court shall summarily determine that issue."). The court makes this summary determination based on the parties' affidavits, pleadings, discovery, and stipulations. *Jack B. Anglin,* 842 S.W.2d at 269. This procedure is similar to a motion for partial summary judgment and is subject to the same evidentiary standards. *In re Jebbia,* 26 S.W.3d 753, 756–57 (Tex.App.—Houston [14th Dist.] 2000, orig. proceeding).

Whether an arbitration agreement is enforceable is a question of law that we review do novo. *See J.M. Davidson,* 128 S.W.3d at 227. In addition, we determine

whether an arbitration agreement binds a nonparty or nonsignatory as a gateway matter. *See Weekley Homes,* 180 S.W.3d at 130; *see also Labatt Food Serv.,* 279 S.W.3d at 643 (when "arbitration agreement is silent about who is to determine whether particular persons are bound by the agreement, courts, rather than the arbitrator, should determine the issue").

### C. Whether Osborn is bound to the arbitration agreement

As a general rule, a party must sign an arbitration agreement to be bound by it. *In re Rubiola,* 334 S.W.3d 220, 224 (Tex.2011) (orig.proceeding). The Texas Supreme Court has recognized that a nonsignatory may be required to arbitrate or may compel arbitration according to a contractual arbitration clause when principles of contract law or agency would bind a nonsignatory to a contract in general. *See id.; Kellogg Brown & Root,* 166 S.W.3d at 738. For example, an arbitration agreement may provide that nonsignatories are to be parties to the agreement. *See Rubiola,* 334 S.W.3d at 224–25 (concluding that because arbitration agreement provided certain nonsignatories were considered parties, such parties could compel arbitration). There are at least six theories under which nonsignatories to an arbitration agreement may be bound to or permitted to enforce its terms: (1) incorporation by reference, (2) assumption, (3) agency, (4) veilpiercing/alter ego, (5) estoppel, and (6) third-party beneficiary. *Kellogg Brown & Root,* 166 S.W.3d at 739. In addition, consistent with the federal doctrine of "direct benefits estoppel," the Texas Supreme Court has held that a nonsignatory plaintiff may be compelled to arbitrate if his claims are "based on a contract" containing an agreement to arbitrate. *Id.* at 740.

Inasmuch as the Branch Parties sought to compel arbitration, they bore the initial burden to prove that a valid arbitration agreement exists. *See Rachal,* 403 S.W.3d at 843; *Rubiola,* 334 S.W.3d at 223–24; *Osornia v. AmeriMex Motor & Controls,* 367 S.W.3d 707, 711 (Tex.App.—Houston [14th Dist.] 2012, no pet.). The Branch Parties argue that Osborn is bound by the MSA's arbitration provision even though he is a nonsignatory based on contract and agency principles, as well as direct benefits estoppel.

We first consider whether Osborn is contractually bound to arbitrate any or all of his claims.[4] *See Kellogg Brown & Root,* 166 S.W.3d at 738. The question of who is actually bound by an arbitration agreement is ultimately a function of the intent of the parties, as expressed within the terms of the agreement. *Rubiola,* 334 S.W.3d at 224. The Branch Parties contend that Turner Branch signed the MSA on behalf of and had the authority to bind Participating Law Firms and their attorneys to arbitration. The Branch Parties argue that Osborn qualifies as an "attorney member[ ] of or affiliated with" a Participating Law Firm. They further argue that, even if Osborn was only employed by the Texas Law Firm—and not also Turner Branch and the New Mexico Law Firm, as alleged in Osborn's amended petition—because he claims to be an attorney with a financial interest in the Avandia MDL, Osborn fits squarely within the definition of a Participating Law Firm.

As a threshold matter, Osborn argues that the Branch Parties never pro-

---

4. Because this issue is dispositive of whether Osborn is bound to arbitrate, we need not reach the Branch Parties' alternative argument that Osborn is bound by direct benefits estoppel (or Osborn's argument that the Branch Parties cannot claim direct benefits estoppel due to unclean hands). *See* Tex. R.App. P. 47.1.

vided the trial court with an authenticated copy of the MSA. Under the summary judgment standard applicable in this arbitration context, copies of documents must be authenticated for them to constitute competent summary judgment evidence. *See Republic Nat'l Leasing Corp. v. Schindler*, 717 S.W.2d 606, 607 (Tex.1986) (per curiam); *In re Estate of Guerrero*, 465 S.W.3d 693, 703–04 (Tex.App.—Houston [14th Dist.] 2015, pet. filed) (en banc). A properly sworn affidavit stating that the attached documents are true and correct copies of the original authenticates the copies so they may be considered as summary judgment evidence. *Guerrero*, 465 S.W.3d at 704 (citing *Republic Nat'l Leasing*, 717 S.W.2d at 607). To assert that the MSA is inadmissible hearsay or that there were defects in the way in which the Branch Parties attempted to authenticate the MSA, Osborn had to raise the objection in the trial court and obtain a ruling. *See id.* at 706; *Rogers v. Cont'l Airlines, Inc.*, 41 S.W.3d 196, 200 (Tex.App.—Houston [14th Dist.] 2001, no pet.). However, a complete absence of authentication is a defect of substance that may be urged for the first time on appeal. *Guerrero*, 465 S.W.3d at 706–07.

To their motion to compel arbitration, the Branch Parties attached the MSA and four exhibits, accompanied by a properly sworn affidavit executed by outside counsel for GSK. Osborn objected to the affidavit on the basis that it was "insufficient as a business records affidavit" because it stated that the affiant was relying on information and belief, not personal knowledge. *See* Tex.R. Evid. 902(10). Osborn "therefore" objected to the affidavit based on "hearsay and authentication."

At the hearing, the Branch Parties argued that the affidavit was a proper business records affidavit. They further argued that, in any event, the "belt and suspenders affidavit" was executed by outside counsel representing GSK in the Avandia MDL, who identified each of the attached documents based on his personal knowledge. *See* Tex.R. Evid. 901(a) & (b)(1). Osborn did not file a controverting affidavit or present any countervailing evidence. He argued that even if the Branch Parties otherwise might be able to authenticate the MSA, it was inadmissible under the hearsay rule. The trial court stated that it was striking four paragraphs of the affidavit but that it was "not going to strike the entire affidavit." The trial court did not orally rule on Osborn's authentication and hearsay objection. The trial court did not issue a written ruling on Osborn's objection, and the order denying the Branch Parties' motion to compel arbitration does not address Osborn's objection.

On appeal, Osborn challenges the affidavit because, with or without the stricken portions, it was not sufficient as a business records affidavit. Osborn does not assert that there was a complete absence of authentication, and there is no dispute that the Branch Parties with their motion to compel arbitration submitted to the trial court an affidavit executed by outside counsel for GSK in an attempt to authenticate the arbitration agreement. Therefore, this case does not present the circumstances present in *In re Estate of Guerrero*, 465 S.W.3d 693 (Tex.App.—Houston [14th Dist.] 2015, pet. filed) (en banc). There, the party opposing a motion to compel arbitration objected to the admissibility of contract documents on authentication grounds. *Id.* at 706. The record did not contain a ruling on this objection. *Id.* Sitting en banc, this court held that an objection to the complete absence of an authenticating affidavit or other attempt to authenticate a document could be raised for the first time on appeal. *See id.* at 706–08.

Here, however, Osborn was required to obtain a ruling on his authentication objection to preserve his appellate challenge. *See id.* at 706; *In re Longoria*, 470 S.W.3d 616, 630 (Tex.App.—Houston [14th Dist.] 2015, orig. proceeding) (citing *In re Guerrero*, 465 S.W.3d at 706); *see also Hicks v. Humble Oil & Ref. Co.*, 970 S.W.2d 90, 93 (Tex.App.—Houston [14th Dist.] 1998, pet. denied) ("Appellants objected to Exxon's exhibits as not being properly authenticated but did not get a ruling of the trial court on any of their objections. By failing to secure rulings on their objections to Exxon's summary judgment proof, appellants have waived any complaint on this appeal as to their admissibility into evidence."). Osborn did not.

Moreover, to the extent that Osborn challenged the affidavit on a separate ground of hearsay, which also is a form objection, he was required to obtain a ruling on such objection to preserve his appellate challenge. *See Dolcefino v. Randolph*, 19 S.W.3d 906, 925–26 (Tex.App.—Houston [14th Dist.] 2000, pet. denied); *see also Methodist Hosps. of Dallas v. Amerigroup Tex., Inc.*, 231 S.W.3d 483, 492 (Tex.App.—Dallas 2007, pet. denied); *Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126, 130 (Tex.App.—Houston [1st Dist.] 1999, no pet.). He did not.

Therefore, Osborn waived his admissibility complaint based on authentication and hearsay.[5]

---

**5.** We reject Osborn's argument that the Branch Parties failed to offer the affidavit and the MSA, and that the trial court did not admit them, into evidence. There is no requirement in summary judgment proceedings that parties offer or that the trial court admit testimony or documents. Rather, a summary judgment hearing is "an exception to the usual and traditional form of procedure wherein witnesses are heard in open court and documentary evidence is offered and received into evidence." *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 441 (Tex.1997)

***The MSA and its arbitration provision.*** The introduction to the MSA states:

GlaxoSmithKline ... and The Branch Law Firm, acting on its own behalf as the Lead Participating Law Firm and on behalf of those law firms identified as "Participating Law Firms" (hereinafter defined[ ]) have reached a confidential settlement of certain "Avandia®" (hereinafter defmed[ ]) actions, disputes, and claims, subject to the terms and conditions set forth in this document."

The MSA "encompasses all Avandia matters, regardless of injury and location of the claim or lawsuit, involving clients currently represented by the Participating Law Firms...." Turner Branch, principal of the New Mexico Law Firm, agreed to and signed the MSA "On Behalf Of The Participating Claimants And The Participating Law Firms."

The MSA defines "Participating Claimants" as:

[A]ll persons, or persons representing the interests of others, who are claiming an injury due to the use of Avandia and whose cases and claims are subject to the terms of this Agreement.

The MSA defines "Participating Law Firms" as:

The Branch Law Firm, as Lead Participating Law Firm, and all other law firms, including all attorney members of

---

(quoting *Richards v. Allen*, 402 S.W.2d 158, 160 (Tex.1966)). This is why the trial court ordinarily conducts a summary proceeding and makes its determination on a motion to compel arbitration based on the parties' affidavits, pleadings, discovery, and stipulations. *See Jack B. Anglin*, 842 S.W.2d at 269 ("[T]he hearing at which a motion to compel arbitration is decided would ordinarily involve application of the terms of the arbitration agreement to undisputed facts, amenable to proof by affidavit.").

or affiliated with each firm, that represent or otherwise have a financial interest in the Participating Claimants whose cases and/or claims are the subject of this Agreement. A list of Participating Law Firms apart from The Branch Law Firm is being provided to GSK and is attached hereto as Exhibit "A."

The MSA further provides that:

Each Participating Law Firm, including all its current and future attorney members of or affiliated with each firm, acknowledges that it shall be bound to the terms and conditions of this Agreement and any Addendum or exhibits hereto.

The arbitration agreement within the MSA provides:

Any challenges to or dispute arising out of or relating to an alleged violation of this Agreement, including but not limited to disputes between GSK and Participating Law Firms and/or Participating Claimants and disputes between or among Participating Law Firms and/or members of Participating Law Firms arising out of or in connection with this Agreement, shall be referred for binding determination to Judicial Arbitration Mediation Services ("JAMS") for resolution, with all costs to be shared equally. The parties shall work together to agree on a binding neutral arbitrator to resolve any and all disputes, and if an agreed upon arbitrator cannot be selected, JAMS' complex resolution procedure

shall control the selection of a neutral arbitrator.

***The New Mexico Law Firm as Participating Law Firm.*** Turner Branch signed the MSA for all the Participating Law Firms, as an attorney with the New Mexico Law Firm, which was designated in the MSA as "Lead Participating Law Firm." There is no challenge to Turner Branch's ability to bind the New Mexico Law Firm. Accordingly, the New Mexico Law firm is a Participating Law Firm subject to the arbitration agreement in the MSA.

***Turner Branch as Participating Law Firm.*** In addition, under the MSA, Participating Law Firms include "all attorney members of or affiliated with each firm." The undisputed facts indicate that Turner Branch is an attorney member of or affiliated with the New Mexico Law Firm. *See* New Oxford American Dictionary 1091 (3d ed.2010) ("member" means "an individual ... belonging to a group"); *id.* at 27 ("affiliated" means "officially attached or connected to an organization"). As a result, Turner Branch is a Participating Law Firm subject to the arbitration agreement in the MSA.[6]

█ ***The Texas Law Firm as Participating Law Firm.*** Turner Branch signed the MSA in his capacity as an attorney with the New Mexico Law Firm. Further, Turner Branch signed the MSA on behalf of all Participating Law Firms; Osborn

---

**6.** Here, the MSA expressly incorporates by reference attorney members of or affiliated with Participating Law Firms, such as the New Mexico Law Firm. In addition, the Texas Supreme Court has observed that, when contracting parties agree to arbitrate all disputes "under or with respect to" a contract, contracting parties to an arbitration agreement generally intend to include disputes about their corporate agents. *In re Vesta Ins. Grp., Inc.,* 192 S.W.3d 759, 762 (Tex.2006) (orig.proceeding) (per curiam). An arbitration clause cannot be avoided by recasting the

claims as torts against an owner, officer, agent, or affiliate, and "it is impractical to require every corporate agent to sign or be listed in every contract." *In re Kaplan Higher Educ. Corp.,* 235 S.W.3d 206, 209 (Tex.2007) (orig.proceeding) (per curiam). Here, Osborn's claims against the individual Turner Branch relate to Branch's actions in conjunction with the Avandia cases and the employment and termination of Osborn, in Branch's official capacities with the New Mexico Law Firm.

does not challenge Turner Branch's ability to bind the Participating Law Firms. Instead, Osborn takes the position that the Texas Law Firm is not a Participating Law Firm because it is not listed in exhibit A to the MSA as a Participating Law Firm. While the MSA does state that "[a] list of Participating Law Firms apart from The Branch Law Firm is being provided to GSK and is attached hereto as Exhibit 'A,' " the definition of Participating Law Firms does not restrict them solely to those law firms listed in the exhibit. To the contrary, a plain reading of the definition of "Participating Law Firms" provides that "all other law firms . . . that represent or otherwise have any financial interest in the" Avandia claimants are Participating Law Firms subject to the arbitration agreement.[7]

The pertinent meaning of to "represent" is to "be entitled or appointed to speak or act for someone," such as regarding his legal affairs. *See id.* at 1481. A "financial interest" essentially means a "stake, share, or involvement" or "legal concern, title, or right" relating to "monetary resources and affairs." *See id.* at 647 ("finance" and "financial"), 905 ("interest"). In his amended petition, Osborn alleges in relevant part that:

- he extensively worked on the defendants'—including the Texas Law Firm's—"Avandia cases that necessitated frequent travel to work in Albuquerque, New Mexico";

- the Avandia cases "settled for substantial attorney's fees";

- the defendants, including the Texas Law Firm, have refused to pay Osborn his 10% bonus of attorney's fees on the Avandia cases;

- the defendants, including the Texas Law Firm, "have been approved to receive or may have already received $[—] of the total fees collected from the Plaintiff Steering Committee allocation for hours billed in the Avandia MDL"; and

- the defendants, including the Texas Law Firm, have failed to pay Osborn his 5% bonus "of the total fees collected from the Plaintiff Steering Committee allocation for hours billed in the Avandia MDL."

*See In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 210 (Tex.2007) (orig.proceeding) (per curiam) (considering students' pleadings when determining whether non-signatory defendant could seek arbitration). Moreover, Osborn does not dispute that the Texas Law Firm was involved in the representation of Avandia claimants or otherwise has a financial interest in the Avandia cases. Under these circumstances, the Texas Law Firm represents or has a "financial interest in the Participating Claimants whose cases and/or claims are the subject of" the MSA. Accordingly, the Texas Law Firm is a Participating Law Firm subject to the MSA's arbitration agreement.

█ *Osborn as Participating Law Firm.* Setting aside Osborn's allegations in his amended petition with regard to his employment by all of the Texas Law Firm, Turner Branch, and the New Mexico Law Firm,[8] Osborn asserts that because he was

---

7. We note that the definition of Participating Claimants includes a separate statement representing and warranting that the initial list of Participating Claimants attached as exhibit B "is comprehensive of all claimants with Avandia-related claims who are represented by the Participating Law Firms or in whose

claims such Participating Law Firms otherwise have any financial interest." The definition of Participating Law Firms does not include any similar representation or warranty with regard to exhibit A.

8. Within his amended petition, Osborn alleges that the defendants offered him employment,

not employed by the New Mexico Law Firm, this defeats the Branch Parties' position. But Osborn does not dispute that he was employed as an associate attorney by the Texas Law Firm at the time the MSA was executed. Moreover, Osborn alleges that he extensively worked on and billed hours in the Avandia cases when he was employed by the Texas Law Firm. As such, he was an "attorney member[ ] of" the Texas Law Firm, which, as discussed above, is a Participating Law Firm with, at a minimum, a "financial interest in the Participating Claimants whose cases and/or claims are the subject of" the MSA. In addition, Osborn was an attorney "affiliated with" the Texas Law Firm. *See* New Oxford American Dictionary 27. Therefore, the definition of a Participating Law Firm encompasses Osborn. At the time of the MSA's execution, because Osborn was a "current . . . attorney member[ ] of or affiliated with" the Texas Law Firm, a Participating Law Firm, he is "bound to the terms and conditions of" the MSA, including the arbitration provision.

On this record, we conclude that the Branch Parties and Osborn are covered by and subject to the valid arbitration agreement contained within the MSA. Accordingly, the Branch Parties can invoke the arbitration agreement with regard to, and Osborn is bound to so arbitrate, claims properly falling within the scope of the arbitration agreement.

**D. Whether Osborn's claims fall within the scope of the arbitration agreement**

 Next, we consider whether the claims raised by Osborn fall within the scope of the arbitration agreement. "[O]nce the party seeking arbitration proves the existence of an enforceable agreement to arbitrate, Texas and federal

law recognize a strong presumption in favor of arbitration such that myriad doubts—as to waiver, scope, and other issues not relating to enforceability—must be resolved in favor of arbitration." *G.T. Leach Builders, LLC v. Sapphire VP., LP*, 458 S.W.3d 502, 521 (Tex.2015) (internal quotation marks omitted). As set forth above, the Branch Parties have established the existence of a valid arbitration agreement enforceable against Osborn. Therefore, there is a presumption in favor of arbitration, and we resolve any doubts regarding the scope of the arbitration agreement in favor of arbitration. *See Kellogg Brown & Root*, 166 S.W.3d at 737. Courts should not deny arbitration unless they can say with positive assurance that an arbitration clause is not susceptible of an interpretation that would cover the dispute at issue. *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex.1995) (orig. proceeding) (per curiam).

 In determining whether claims fall within the scope of the arbitration agreement, we focus on the factual allegations of the pleading, rather than the legal causes of action asserted. *Id.* at 900; *In re Prudential Sec., Inc.*, 159 S.W.3d 279, 283 (Tex.App.—Houston [14th Dist.] 2005, orig. proceeding). When the contract contains a broadly written arbitration clause, as long as the allegations touch matters, have a significant relationship with, or are inextricably enmeshed or factually intertwined with the contract, the claim will be arbitrable. *See AutoNation USA Corp. v. Leroy*, 105 S.W.3d 190, 195–96 (Tex.App.— Houston [14th Dist.] 2003, no pet.) ("The language in the arbitration provision here, requiring arbitration of any controversy or claim 'arising out of or relating to' the Purchase Agreement or the breach thereof, is recognized as broad language favor-

and that he accepted and was employed in

Houston, Texas, by the defendants.

ing arbitration."). · However, if the facts alleged stand alone, completely independent of the contract, and the claim could be maintained without reference to the contract, the claim is not subject to arbitration. *Id.* at 195.

The Branch Parties argue that Osborn's claims fall within the MSA's broad arbitration clause:

> X. CHALLENGES TO OR DISPUTES INVOLVING THIS AGREEMENT
>
> Any challenges to or disputes arising out of or relating to an alleged violation of this Agreement, including but not limited to disputes between GSK and Participating Law Firms and/or Participating Claimants and disputes between or among Participating Law Firms and/or members of Participating Law Firms arising out of or in connection with this Agreement, shall be referred for binding determination to Judicial Arbitration Mediation Services ("JAMS") for resolution, with all costs to be shared equally. The parties shall work together to agree on a binding neutral arbitrator to resolve any and all disputes, and if an agreed upon arbitrator cannot be selected, JAMS' complex resolution proceedings shall control the selection of a neutral arbitrator.

The Branch Parties contend that the lawsuit between the Branch Parties and Osborn qualifies as a "dispute[ ] between or among Participating Law Firms and/or members of Participating Law Firms arising out of or in connection with this Agreement." The Branch Parties argue that, based on Osborn's allegations, his claims are factually intertwined and inextricably enmeshed with the MSA.

Osborn attempts to narrow the scope of the arbitration clause, arguing that it can only apply to "disputes arising out of or relating to an alleged violation of" the MSA. However, such interpretation fails to take into account the subsequent phrase: "including but not limited to disputes between GSK and Participating Law Firms and/or Participating Claimants and disputes between or among Participating Law Firms and/or members of Participating Law Firms arising out of or in connection with" the MSA. This "including" phrase provides nonexclusive examples of "disputes arising out of or relating to an alleged violation of this Agreement" that the arbitration agreement covers. *See* Tex. Gov't Code Ann. § 311.005(13) (West 2013) (" "Includes" and "including are" terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded."); *Siemens Energy, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 14–13–00863–CV, 2014 WL 2531577, at *6 (Tex. App.—Houston [14th Dist.] June 3, 2014, pet. denied) (mem.op.) ("The explanatory "including" phrase functions to enlarge rather than limit the previous phrase."). Therefore, as long as the claims at issue can be construed as a "dispute[ ] between or among Participating Law Firms and/or members of Participating Law Firms arising out of or in connection with" the MSA, they fall within the scope of the arbitration agreement.

Moreover, the unambiguous language of the arbitration clause states that Participating Law Firms and their members have agreed to arbitrate any disputes "arising out of or in connection" with the MSA.[9] The use of such broad language evidences

---

9. *Cf. Osornia,* 367 S.W.3d at 712–14 (parties only agreed to arbitrate all claims "arising out of" and not all claims "relating to" or "connected with" settlement agreement at issue).

the parties' intent to be inclusive rather than exclusive. *See TMI, Inc. v. Brooks*, 225 S.W.3d 783, 791 & n. 7 (Tex.App.—Houston [14th Dist.] 2007, pet. denied) (substitute op.); *see also FD Frontier Drilling (Cyprus), Ltd. v. Didmon*, 438 S.W.3d 688, 695 (Tex.App.—Houston [1st Dist.] 2014, pet. denied) (broad arbitration clause—"[a]ny dispute arising out of or in connection with this contract"—"embrace[d] all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute"); *Glassell Producing Co., Inc. v. Jared Res., Ltd.*, 422 S.W.3d 68, 77–78 (Tex.App.—Texarkana 2014, no pet.) (clause agreeing to arbitrate claims "arising in any way out of, relating to or in connection with this letter agreement" interpreted broadly); *ODL Servs., Inc. v. ConocoPhillips Co.*, 264 S.W.3d 399, 413 (Tex.App.—Houston [1st Dist.] 2008, no pet.) (language "any dispute, controversy or claim arising out of or in connection with this Contract" is broad); *cf. Smith v. Kenda Capital, LLC*, 451 S.W.3d 453, 460 (Tex.App.—Houston [14th Dist.] 2014, no pet.) ("The [forum selection] clause's 'arising out of or in connection with' language indicates a broad reach.").

Because the arbitration provision is broad, "absent any express provision excluding a particular grievance from arbitration, only the most forceful evidence of purpose to exclude the claim from arbitration can prevail," and Osborn has the burden of showing that his claims against the Branch Parties fall outside the scope of the arbitration clause. *See Osornia*, 367 S.W.3d at 712 (citing *Marshall*, 909 S.W.2d at 900, and *Babcock & Wilcox Co. v. PMAC, Ltd.*, 863 S.W.2d 225, 230 (Tex.

App.—Houston [14th Dist.] 1993, writ denied)).

Osborn has failed to meet this burden. Where, as here, the contract includes a broad arbitration clause, we consider whether the facts alleged are sufficiently intertwined with the contract and thus arbitrable. *See Jack B. Anglin*, 842 S.W.2d at 271; *AutoNation USA*, 105 S.W.3d at 195. All the parties involved are Participating Law Firms or members of Participating Law Firms. Osborn alleges the Branch Parties promised that he would be paid percentage bonuses of attorney's fees for all of his work—and specifically on the Avandia cases. Osborn further alleges that the Branch Parties failed to pay him these bonuses for his work, particularly on the Avandia cases, "which settled for substantial attorney's fees." Such dispute is certainly "in connection with" the MSA, the agreement governing the settlement of those Avandia cases. Regardless of any alleged employment contract with the Texas Law Firm, Osborn's dispute is not completely independent of the MSA. Without the MSA, there would be no basis for the majority of Osborn's claims, whether sounding in contract or tort, that the Branch Parties misrepresented they would and failed to pay him certain percentage bonuses of attorney's fees stemming from the settlement of the Avandia cases.[10] *See AutoNation USA*, 105 S.W.3d at 197–98 (holding dispute over Retail Installment Contract was covered by arbitration clause in separate Purchase Agreement because "but for" purchase, there would have been no financing transaction). Therefore, on these facts, and given the strong presumption in favor of arbitration, we conclude that the

---

**10.** Osborn argues that there is no need to even mention the MSA for him to make his claims because he now has obtained the amount of wire transfers received by the Branch Parties via third-party subpoena. However, these alleged wire transfers would not have occurred but for the existence of the MSA.

arbitration clause covers the dispute at issue.

We reject Osborn's argument that "the MSA specifically excludes disputes over attorney's fees further narrowing the scope of the arbitration provision." The attorney's fees provision [11] upon which Osborn relies addresses the Participating Claimants' obligations and GSK's lack of responsibility to pay attorney's fees to the Participating Law Firms. Exhibit D to the MSA, the form confidential release to be executed by Participating Claimants, also states that GSK has no responsibility for paying attorney's fees. However, no language within the attorney's-fees provision or the release expressly excludes Osborn's dispute, or even purports to limit the scope of the MSA's arbitration agreement, which plainly covers disputes between Participating Law Firms and/or their members arising out of or in connection with the MSA.

■ Finally, we cannot agree with Osborn that certain claims should not be arbitrated. Specifically, Osborn points to his contract claim related to nonpayment of his salary; his contract claims related to nonpayment of his bonuses on the non-Avandia cases; his fraudulent inducement and fraud claims related to the 10% bonus; and his abuse of process and malicious prosecution claims.[12] We have not found, nor does Osborn cite, any authority to support his position that, in the face of the existence of arbitrable claims connected to the Avandia settlement, his other claims should not also be submitted to arbitration. Instead, Texas law favors the joint resolution of multiple claims to prevent multiple determinations of the same matter. *Prudential Sec.*, 159 S.W.3d at 283 (citing *Jack B. Anglin*, 842 S.W.2d at 271). Here, Osborn's non-Avandia-specific claims likely will involve development of many of the same facts relating to the Branch Parties' actions with regard to their employment and termination of Osborn, as well as their actions in allegedly promising yet not paying him any 10% bonus of attorney's fees.

We decide in favor of the Branch Parties on their first issue.

### E. Waiver of arbitration

We next consider whether the trial court properly could have denied the Branch Parties' motion to compel arbitration because Osborn established waiver as a defense to arbitration. We conclude that it could not.

■ Under a proper abuse-of-discretion review, whether waiver has occurred is a question of law subject to de novo review. *G.T. Leach Builders*, 458 S.W.3d at 511; *Perry Homes v. Cull*, 258 S.W.3d 580, 598 & n. 102 (Tex.2008). "Waiver—the 'intentional relinquishment of a known right'—can occur either expressly, through a clear repudiation of the right, or impliedly, through conduct inconsistent with a claim to the right." *G.T.*

---

11. The MSA states:
 Nothing in this Agreement shall affect the obligation of any Participating Claimant to pay attorneys' fees and costs pursuant to any agreement such Participating Claimant may have with his or her counsel. GSK shall have no responsibility whatsoever for the payment of Participating Claimants' attorneys' fees. Any division of the Settlement Amount is to be determined by Participating Claimant and the Participating Law Firms and shall in no way affect the validity of this Agreement or the Confidential Release executed by any Participating Claimant.

12. The Branch Parties take the position that Osborn's abuse-of-process and malicious-prosecution claims concern the Branch Parties' alleged actions after Osborn allegedly removed confidential information related to the Avandia settlement, in alleged violation of the MSA's confidentiality requirement.

*Leach Builders,* 458 S.W.3d at 511 (citing *Perry Homes,* 258 S.W.3d at 590–91, 594).

■ ***Express waiver.*** Express waiver arises when a party affirmatively indicates that it wishes to resolve the case in the judicial forum rather than in arbitration. *Okorafor v. Uncle Sam & Assocs., Inc.,* 295 S.W.3d 27, 39 (Tex.App.—Houston [1st Dist.] 2009, pet. denied) (citing *In re Citigroup Global Mkts.,* 258 S.W.3d 623, 626 (Tex.2008) (orig.proceeding) (per curiam)). Osborn primarily points to a statement made to the trial court by trial counsel for the Branch Parties—"we'll commit we're going to trial"—to support his position that the Branch Parties expressly waived arbitration. Osborn did not rely on this statement in his response to the Branch Parties' motion to compel. Even if this argument is preserved, we cannot conclude that such statement rises to the level of an express waiver. First, the expanded context of trial counsel's statement indicates that it was conditional: "We're not asking for a continuance, and if you say we're going to trial … we'll commit we're going to trial." Further, the record indicates that trial counsel made this statement during an April 2013 hearing prior to the Branch Parties' ever filing any motion to compel. Nor do statements arguably inconsistent with an intent to exercise the right to arbitrate constitute an express waiver of that right. *E.g., G.T. Leach Builders,* 458 S.W.3d at 511 (rule 11 agreement on trial date was not express waiver); *In re Fleetwood Homes of Tex., L.P.,* 257 S.W.3d 692, 694 (Tex.2008) (orig.proceeding) (per curiam) (email correspondence regarding proposed trial setting was not express waiver). Finally, the Branch Parties did not oppose arbitration prior to moving to compel or ever seek to withdraw their motion to compel. To the extent the trial court based its denial of the Branch

Parties' motion to compel on express waiver, this decision constituted error.

■ ***Implied waiver.*** Implied waiver is based on the totality of the circumstances, and asks (1) whether a party has substantially invoked the judicial process (2) resulting in prejudice to the opposing party, where prejudice means inherent unfairness caused by "a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage." *G.T. Leach Builders,* 458 S.W.3d at 511–12, 515; *Perry Homes,* 258 S.W.3d at 589–90, 591, 597. Because the law favors and encourages arbitration, in close cases, the presumption against waiver governs. *Perry Homes,* 258 S.W.3d at 593; *Baty v. Bowen, Miclette & Britt, Inc.,* 423 S.W.3d 427, 438 (Tex.App.—Houston [14th Dist.] 2013, pet. denied). This is why the party opposing arbitration faces a "high hurdle" in showing implied waiver of arbitration. *G.T. Leach Builders,* 458 S.W.3d at 511–12. We conclude that Osborn has not cleared the hurdle here.

■ Courts consider a "wide variety" of factors when considering whether a party has substantially invoked the judicial process, including:

- how long the party moving to compel arbitration waited to do so;
- the reasons for the movant's delay;
- whether and when the movant knew of the arbitration agreement during the period of delay;
- how much discovery the movant conducted before moving to compel arbitration, and whether that discovery related to the merits;
- whether the movant requested the court to dispose of claims on the merits;
- whether the movant asserted affirmative claims for relief in court;

- the extent of the movant's engagement in pretrial matters related to the merits (as opposed to matters related to arbitrability or jurisdiction);
- the amount of time and expense the parties have committed to the litigation;
- whether the discovery conducted would be unavailable or useful in arbitration;
- whether activity in court would be duplicated in arbitration; and
- when the case was to be tried.

*Id.* at 512 (citing *Perry Homes*, 258 S.W.3d at 590–91).

Osborn first initiated this lawsuit against the Branch Parties in June 2012. The Branch Parties answered and filed counterclaims a month later. Discovery ensued, and Osborn and Turner Branch were deposed. In June 2013, Osborn amended his lawsuit to add the New Mexico Law Firm. At the same time, the Branch Parties moved to compel arbitration. Osborn asserts that the Branch Parties' actions in this case between June 2012 and June 2013 amount to waiver of any right they have to arbitrate Osborn's claims.

Osborn contends that the Branch Parties substantially invoked litigation where they filed counterclaims, and initiated and engaged in "significant amounts of discovery." The Branch Parties argue that it was Osborn who filed "90% of the efforts to move the case forward." In any event, merely engaging in litigation—such as filing counterclaims, filing motions for relief, and participating in pretrial discovery— "is not enough." *Id.* at 512 (quoting *D. Wilson Constr.*, 196 S.W.3d at 783). Here, it is Osborn who sued the Branch Parties. *See id.* at 512–13. Moreover, a defendant often has to assert compulsory counterclaims or it risks losing them. *See id.* at 513 (citing Tex.R. Civ. P. 97(a)). Much of the Branch Parties' discovery efforts involved moving to quash Osborn's discovery and opposing his discovery motions, which is conduct defensive in nature. *See id.* ("A party's litigation conduct aimed at defending itself and minimizing its litigation expenses, rather than at taking advantage of the judicial forum, does not amount to substantial invocation of the judicial process."). Even if their discovery efforts were "significant," the Branch Parties had not conducted "full discovery" when they moved to compel arbitration. *See Baty*, 423 S.W.3d at 437. Finally, once they moved to compel arbitration, the Branch Parties continually sought to stay the litigation.

Osborn also asserts that the Branch Parties knew of the arbitration clause long before the case was filed, failed to direct any of their initial efforts toward arbitration, and only sought arbitration to avoid the trial court's discovery orders. The Branch Parties insist that they moved to compel arbitration shortly after they realized Osborn was attempting to discover and rely on confidential information, particularly, the settlement amount, from the MSA. In other words, according to the Branch Parties, the period of delay was only two months. Setting aside whether this explanation is plausible, the Texas Supreme Court has refused to find waiver based on mere delay, even where such delay was longer than 12 months. *E.g., Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 S.W.3d 573, 575–76 (Tex.2015) (per curiam) (19–month delay); *In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 763 (Tex.2006) (orig.proceeding) (per curiam) (two-year delay); *see also Cooper Indus., LLC v. Pepsi–Cola Metro. Bottling Co., Inc.*, 475 S.W.3d 436, 451–453 (Tex.App.—Houston [14th Dist.] Aug. 25, 2015, pet. pending) (28–month delay).

Finally, Osborn contends that the Branch Parties waived arbitration because they filed a motion for summary judgment on Osborn's breach-of-contract and fraud claims several months before moving to compel arbitration. The Branch Parties characterize their summary judgment motion as "an attempt to avoid continued litigation" and emphasize that it was only a partial motion. While seeking disposition on the merits is a "key" factor in deciding waiver, here, we conclude that this factor is tempered by the defensive posture of the motion. *See G.T. Leach Builders*, 458 S.W.3d at 513 (citing *Keytrade USA, Inc. v. Ain Temouchent M/V*, 404 F.3d 891, 897 (5th Cir.2005) (declining to find waiver where movant sought summary judgment "from a defensive posture")).

Although the circumstances here involve certain factors, particularly filing for summary judgment, that may render this a close case, the strong presumption against waiver nevertheless governs. *See Baty*, 423 S.W.3d at 438. Considering the totality of the circumstances, we conclude that the Branch Parties have not substantially invoked the litigation process in contravention of their right to arbitration.

 ***Prejudice.*** Further, to avoid arbitration Osborn must show that the judicial process was substantially invoked to his actual "detriment or prejudice." *See G.T. Leach Builders*, 458 S.W.3d at 511–12. Prejudice refers to the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue. *Perry Homes*, 258 S.W.3d at 597. Prejudice may result when a party seeking arbitration first sought to use the judicial process to gain access to information that would not have been available in arbitration, but propounding discovery will not, in and of itself, result in

waiver of a right to compel arbitration. *G.T. Leach Builders*, 458 S.W.3d at 515. And, while delay may be a factor both in terms of whether the movant has substantially invoked the judicial process and whether the nonmovant has suffered prejudice, mere delay is not ordinarily enough, even if it is substantial. *Id.*

Osborn argues that he suffered unfair prejudice because the Branch Parties will be able to "retreat to arbitration where the Trial Court's order that Branch produce the amount of attorney's fees earned in the Avandia cases or face sanctions does not exist"; where the limited Judicial Arbitration Mediation Services (JAMS) discovery rules would not permit all the extensive discovery already conducted; where Osborn had incurred "massive cost expended over a year of litigation"; and where "Osborn would be forced to relitigate the same case with the same issues that have already been litigated."

Osborn has failed to demonstrate prejudice. Osborn did not provide the JAMS rules, much less explain how they allegedly "severely limit" discovery here. There is also no indication that the discovery conducted so far, much of which was propounded by Osborn in the lawsuit he filed, would not be permitted in the arbitration proceedings or that the Branch Parties would be able to "retreat" from providing relevant information from the MSA, the very basis for arbitrating Osborn's claims. Nor did Osborn show what "massive cost" he incurred; how much of such cost was attributable to the Branch Parties' complained-of actions; or whether such cost was for matters that could not be used in arbitration.

We conclude that the Branch Parties' participation in litigation has not caused Osborn the kind of prejudice necessary to clear the "high hurdle" of waiver of arbitration. Because Osborn failed to carry

his heavy burden of showing waiver, we decide in favor of the Branch Parties on their second and third issues.

### III. Conclusion

For these reasons, the trial court erred in denying the Branch Parties' motion to compel arbitration. We reverse the trial court's order denying the motion and remand for further proceedings consistent with this opinion.

